**MICHAEL E. FARNELL,** OSB #922996
Email:  mfarnell@pfglaw.com
**KRISTOPHER L. KOLTA**, OSB #106442
Email:  kkolta@pfglaw.com
PARSONS FARNELL & GREIN, LLP
1030 SW Morrison Street
Portland, Oregon  97205
Telephone:  (503) 222-1812
Facsimile:  (503) 274-7979
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **HOSPITALITY MANAGEMENT, INC.,** an Oregon corporation,<br><br>                              Plaintiff,<br><br>        v.<br><br>**PREFERRED CONTRACTORS INSURANCE COMPANY**, a Montana corporation,<br><br>                              Defendant. | Case No. 3:18-cv-00452-YY<br><br>**PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

Table of Contents

I.      LR 7.1(a) CERTIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    MEMORANDUM IN SUPPORT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        B.    Factual background of HMI's breach of contract claim. . . . . . . . . . . . . . . . . . . . . . 2

                1.    HMI's liability in the underlying lawsuit. . . . . . . . . . . . . . . . . . . . . . . . 2

                2.    The Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        C.    Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                1.    Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                2.    Oregon Rules of Policy Interpretation. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        D.    HMI is entitled to summary judgment on its contract claim as it performed
              two separate scopes of work with each constituting a separate "occurrence"
              resulting in covered "property damage.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                1.    PCIC concedes coverage of damage resulting from HMI's work on
                      windows and siding under the 2010-2011 policy, entitling HMI to a
                      per-"occurrence" limit of $1,000,000. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                2.    The 2009-2010 policy period is also triggered by damage resulting
                      from HMI's work on the siding and windows.. . . . . . . . . . . . . . . . . . . . . 16

                3.    In each of the 2009-2010 and 2010-2011 policy periods, an additional,
                      covered "occurrence" arose from HMI's separate scope of work on
                      the attic venting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        E.    HMI is also entitled to summary judgment on its bad faith breach of
              fiduciary duty claim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                1.    Oregon's legal standards governing claims handling.. . . . . . . . . . . . . . . 24

                2.    The undisputed factual background o f PCIC's claim investigation and

handling is characterized by (at best) omission.. . . . . . . . . . . . . . . . . . 27

3.    PCIC's corporate designee revealed the factors relevant to PCIC
      settlement decisions but could not identify any cogent evaluation of
      those factors in regard to the claiims against HMI in the Underlying
      Lawsuit.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      a.    Coverage: To this day, PCIC has not reached an indemnity
            coverage decision (despite formally denying coverage in this
            action).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      b.    Damages: As PCIC had commissioned no expert analysis in its
            insured's favor for trial, HMI would have been unable to
            counter underlying plaintiff's damages estimate of $43.4
            million.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      c.    Liability: PCIC accepted that HMI faced over $4 million in
            liability and that $2.5 million was a reasonable settlement.. . . . . 35

4.    PCIC's claims-handling falls short of every aspect of its fiduciary
      duty.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Table of Authorities

## Cases

*Alexander Mfg., Inc. v. Illinois Union Ins. Co.*, 666 F.Supp.2d 1185 (2009)......................... 26, 38
*Alkemade v. Quanta Indemnity Co.*, 687 Fed. Appx. 649 (9th Cir. 2017)................. 10, 16, 18, 24
*Brock v. State Farm Mut. Auto. Ins. Co.*, 195 Or. App. 519, 98 P.3d 759 (2004)....................... 15
*Cedell v. Farmers Ins. Co. of Washington*, 176 Wash.2d 686, 295 P.3d 239 (2013)................. 33
*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ..................... 8
*Collins v. Farmers Ins. Co. of Oregon* , 312 Or. 337, 822 P.2d 1146 (1991) ............................ 10
*Dairyland Power Coop. v. United States*, 79 Fed. Cl. 709 (2007) ......................................... 12
*Eastham v. Oregon Auto Ins. Co.*, 273 Or. 600, 540 P.2d 364 (1975) ....................................... 25
*Employers Ins. of Wausau v. Tektronix, Inc.*, 211 Or.App. 485, 156 P.3d 105 (2007) ...... 8, 10, 19
*Eslamizar v. Am. States Ins. Co.*, 134 Or. App. 138, 894 P.2d 1195 (1995) ............................ 15
*Farris v. USF&G*, 284 Or. 453, 587 P.2d 1015(1978) .......................................................... 24
*First Fin. Ins. Co. v. Reeves*, No. B148399, 2002 WL 661544 (Cal. App. Apr. 23, 2002).......... 23
*Fountaincourt Homeowners' Ass'n v. Fountaincourt Dev., LLC*, 264 Or. App. 468,……………..
334 P.3d 973 (2014), *aff'd* 360 Or. 341 (2016) ....................................................... 12, 19
*Fountaincourt Homeowners' Ass'n v. Fountaincourt Dev., LLC*, 360 Or. 341, ………………….
380 P.3d 916 (2016)..................................................................... 12, 19, 21, 22
*Georgetown Realty, Inc. v. Home Ins. Co.*, 313 Or. 97 (1992)................................................. 26
*Goddard v. Farmers Ins. Co. of Oregon*, 173 Or. App. 633, 22 P.3d 1224 (2001).... 25, 26, 27, 37
*Gonzales v. Farmers Ins. Co. of Oregon*, 210 Or. App. 54, 150 P.3d 20 (2006) .......................... 9
*Groshong v. Mut. of Enumclaw Ins. Co.*, 329 Or. 303, 985 P.2d 1284 (1999)............................. 9
*Hoffman Constr. Co. v. Fred S. James & Co. of Or.*, 313 Or. 464, 836 P.2d 703 (1992)..... passim
*Ivanov v. Farmers Ins. Co. of Oregon*, 344 Or. 421, 185 P.3d 417 (2008) ................................ 26
*Kennedy v. Allied Mutual Ins. Co.,* 952 F.2d 262 (9th Cir. 1991) ............................................. 5
*Klinicki v. Lundgren*, 298 Or. 662, 695 P.2d 906 (1985) ....................................................... 25
*Konell Construction & Demolition Corp. v. Valiant Ins. Co.*, No. 03-412,……………………..
2006 WL 1360956 (D. Or. May 15, 2006) ......................................................... 10
*Kriz v. Gov't Employees Ins. Co.*, 42 Or. App. 339, 600 P.2d 496 (1979) ................................ 26
*Kuzmanich v. United Fire and Cas.*, 242 Or. 529, 410 P.2d 812 (1966).................................... 24
*La Noue Dev., LLC v. Assurance Co. of America*, 2005 WL 1475599 (D. Or. 2005)................. 26
*Land v. West Coast Life Ins. Co.*, 201 Or. 397, 270 P.2d 154 (1954)........................................ 10
*Maine Bonding & Cas. Co. v. Centennial Ins. Co.*, 298 Or. 514 (1985) .................. 24, 25, 27, 36
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, ………………………………..
106 S.Ct. 1348, 89 L. Ed. 2d 538 (1986).................................................................... 8
*Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928) ...................................................... 25
*Memory Integrity, LLC v. Intel Corp.*, 308 F.R.D. 656 (D. Or. 2015) ....................................... 11
*Mid-Century Ins. Company v. Perkins*, 209 Or. App. 613, 149 P.3d 265 (2006)......................... 9
*Morrow Corp. v. Harleysville Mut. Ins. Co.*, 110 F.Supp.2d 441 (E.D. Va. 2001)...................... 17
*Mut. of Enumclaw Ins. Co. v. Rohde*, 170 Or. App. 574, 13 P.3d 1006 (2000)............................ 9
*N. Pac. Ins. Co. v. Am. Mfrs. Mut. Ins. Co.*, 200 Or. App. 473, 115 P.3d 970 (2005) ................. 9
*N. Pac. Ins. Co. v. Hamilton*, 332 Or. 20, 22 P.3d 739 (2001) ................................................ 10
*Reilly v. NatWest Mkts. Group, Inc*., 181 F.3d 253 (2d Cir. 1999)........................................... 12
*Schnitzer Investment Corp. v. Certain Underwriters at Lloyd's of London,*………………………..
197 Or. App. 147, 104 P.3d 1162 (2005)................................................................... 9
*Snapp v. United Transp.Union*, 889 F.3d 1088 (9th Cir. 2018) .............................................. 13
*St. Paul Fire & Marine Ins. Co., Inc. v. McCormick & Baxter Creosoting Co.,*…………...………
324 Or 184, 923 P2d 1200 (1996) ......................................................................... 22
*State v. Zurich Specialties London Ltd.*, 116 Wash. App. 1033, 2003 WL 1824966 (2003) ....... 19

O:\10412001\0064c klk HMI's MSJ.doc

*Stewart Title Guar. Co. v. Credit Suisse, Cayman Islands Branch*,……………………………..
No. 1:11–CV–227–BLW, 2013 WL 1385264 (D. Idaho Apr. 3, 2013) ..................................... 33
*Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) ................................................................................. 8
*Tualatin Valley Housing Partners v. Truck Ins. Exchange*, 208 Or. App. 155,……………………
144 P.3d 991 (2006)........................................................................................................................... 9
*Valley Forge Ins. Co. v. Am.  Safety Risk Retention Group, Inc.*,…………………………………
No. CV-05-71-HU, 2006 WL 314455 (D Or Feb. 9, 2006) ........................................................ 23
*Wausau Underwriters Ins. Co. v. Danfoss, LLC*, 310 F.R.D. 683 (S.D. Fla. 2015).................... 13

## Statutes
ORS 742.013.............................................................................................................. 14, 15, 32
ORS 742.016...................................................................................................................... 14, 32
ORS 742.061.............................................................................................................................. 1
ORS 742.208............................................................................................................................ 15
ORS 746.230.................................................................................................................. 5, 26, 36

## Other Authorities
Black's Law Dictionary (5th ed. 1979)................................................................................... 17
Webster's Third New International Dictionary (1993)...................................................... 17, 18

## Rules
Fed. R. Civ. P. 56 ................................................................................................................... 1, 8

## Treatises
7 James Wm. Moore et al., *Moore's Federal Practice* § 30.25[3] (3d ed. 2016)........................ 13

## I.   LR 7.1(a) CERTIFICATION

Counsel for plaintiff,  Hospitality Management, Inc. ("HMI"), and counsel for defendant, Preferred Contractors Insurance Company ("PCIC"), have conferred by telephone regarding this motion but have been unable to resolve their dispute about the issues presented herein.

## II.   MOTION

Pursuant to Fed. R. Civ. P. 56, Plaintiff HMI respectfully moves the Court for full summary judgment on both its breach of contract and bad faith breach of fiduciary duty claims, including an award of attorney fees pursuant to ORS 742.061.

## III.   MEMORANDUM IN SUPPORT

### A.      Introduction

This is an insurance coverage dispute in which PCIC provided HMI with a defense in an underlying lawsuit pursuant to a reservation of rights but, by its own sworn admissions, failed to meaningfully evaluate either HMI's indemnity coverage or settlement prospects.  Despite being in control of HMI's defense in the underlying lawsuit, PCIC now states under oath that it declined multiple settlement demands, including one for a single, per-"occurrence" policy limit, and failed to make *any* settlement offers, all without conducting an indemnity coverage analysis. Without the assistance—indeed, without the involvement at all—of its insurer, HMI was compelled to take steps to protect its own interests, and it did so by entering into a $2.5 million covenant judgment with the underlying third-party plaintiff on the eve of trial in the underlying lawsuit.  Amended Complaint, Ex. E (Dkt. 17-5).  This coverage action ensued.

Page 1 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

Despite its failure to offer even one dollar in the underlying lawsuit, PCIC now appears to concede that at least some portion of this $2.5 million judgment is covered.[1]  Furthermore, to this day, PCIC has been unable to articulate a cogent basis for refusing to participate in settlement discussions on HMI's behalf or for denying indemnity coverage following entry of judgment against its insured.  HMI moves for full summary judgment on both its breach of contract and bad faith breach of fiduciary duty claims.

### B.    Factual background of HMI's breach of contract claim

While HMI's two claims, breach of contract and breach of fiduciary duty, have an overlapping factual nexus, the facts and legal basis relevant to HMI's breach of contract claim are considerably more straightforward.  Thus, for ease of reference, HMI first addresses its contract claim.

### 1.    HMI's liability in the underlying lawsuit

Underlying plaintiff, Commons at Cedar Mill, sued general contractor, Keyway Corporation ("KeyWay"), in an action styled as *Commons at Cedar Mill v. KeyWay Corp., et al.*, Washington County Circuit Court, case no. C154229CV (the "Underlying Lawsuit").  Amended Complaint, Ex. A (Dkt. 17-1).  Commons sought from KeyWay damages arising out of alleged construction defects and resultant property damage associated with substantial renovations to the Commons at Timber Creek, a 50-building apartment complex located at 12450 NW Barnes Road, Portland, Oregon 97229 (the "Project").  *Id.*  In turn, KeyWay, as third-party plaintiff,

---

[1] PCIC, via its corporate designee, stated, "[O]nce the job was completed sometime in 2010 is when the manifestation occur[ed]."  Kolta Declaration in Support of HMI's Motion for Summary Judgment ("Kolta Dec."), Ex. 1 (Transcript of PCIC's Fed. Civ. R. Pro. 30(b)(6) deposition) at page 140 ("30(b)(6) Deposition").  As further explained below, the "manifestation" of damage triggers PCIC's insurance coverage.  PCIC further concedes that it does not know if and the extent to which its policy exclusions could apply to limit or preclude HMI's coverage, and PCIC swears that it has not denied coverage of the stipulated judgment entered against HMI.  *Id.* at 126-36.

initiated an action against the Project's subcontractors, including HMI, for their proportionate share of liability.  Amended Complaint, Ex. B (Dkt. 17-2).  As to HMI, KeyWay alleged liability arising out of two distinct scopes of defective construction and resultant property damage.  *Id.* Specifically, KeyWay alleged that HMI was liable for defective work on siding and windows, leading to water intrusion, and defective work on attic venting shafts, leading to condensation and associated attic damage.  *Id.* at page 4 (alleging "property damage resulting from the improper installation and/or repair of windows, siding, roof ventilation and related components for which HMI was responsible").  PCIC retained counsel to defend HMI.

Both defense counsel's pre-trial report issued in the Underlying Lawsuit and HMI's unrebutted expert report issued in this coverage action further clarify the basis of HMI's underlying liability.  First, as to windows and siding, the work was performed and completed by HMI between February of 2009 and August 2010.  Kolta Dec., Ex. 2 at 2 ("Expert Report"). "Property damage began soon after the window . . . and siding work was completed and put to its intended use.  While this damage was initially masked by replacement siding, it would have been readily discoverable upon reasonable inspection."  *Id.*  According to defense counsel, HMI performed window and/or siding repair on approximately 90% of the buildings.  Kolta Dec., Ex. 3 at HMI_0114404 ("Baran Pre-Trial Report").

Second, as to the defective attic venting, the work was performed and completed by HMI between February of 2009 and October of 2010.  Expert Report at 1.  "Property damage began soon after the defective/improper work was completed and put to its intended use. While this damage was initially contained within the buildings' uninhabited attic spaces, it would have been readily observable upon entering the attics."  *Id.*  "HMI performed a significant portion if not all of the exhaust vent work."  *Id.* at 3.  Defense counsel reported to PCIC that "[s]everal witnesses

Page 3 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

testified that an HMI crew picked up [the bathroom venting fan] work." Baran Pre-Trial Report at HMI_0114405; *see also* Expert Report at 3 ("HMI performed a significant portion if not all of the exhaust vent work.").

Underlying plaintiff issued a settlement demand that documented in detail both HMI's defective work on siding/windows and attic venting, along with the damage resulting therefrom. *See generally* Kolta Dec., Ex. 4. With PCIC declining all settlement demands, refusing to participate in settlement discussions, and generally asleep at the settlement wheel, HMI did the only thing abandoned insureds can do to protect their interests—it agreed to stipulate to a $2.5 million judgment in exchange for underlying third-party plaintiff's covenant not to execute except to the extent of HMI's insurance assets. Amended Complaint, Ex. E (Dkt. 17-5).

### 2.   The Policies

PCIC issued a series of four successive policies to HMI, which were in full force and effect from at least February 20, 2009 to February 20, 2013 as follows:

| Policy Number | Policy Period |
|---|---|
| PC 2751 | February 20, 2009 – February 20, 2010 |
| PC 2751-02 | February 20, 2010 – February 20, 2011 |
| PC 2751-03 | February 20, 2011 – February 20, 2012 |
| PC 2751-04 | February 20, 2012 – February 20, 2013 |

Amended Complaint (Dkt. 17). Each of the above policies has per-occurrence limits of $1 million and aggregate limits of $2 million. Schulze Declaration in Support of PCIC's Motion for Summary Judgment ("Schulze Dec."), Ex. 1-4 (Dkt. 36-2 to 36-5). While PCIC defended under a kitchen-sink, 26-page reservation of rights letter, *see* Kolta Dec., Ex. 5, it has never specified,

Page 4 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

either in the Underlying Lawsuit or in this coverage action, the basis or bases upon which it refused to acknowledge indemnity coverage and declined to participate in the otherwise global settlement of the Underlying Lawsuit.  Indeed, while PCIC denied indemnity coverage in this action, *see* Answer to HMI's Amended Complaint (Dkt. 18), paragraph 20, it has also stated under oath that it has yet to make an indemnity determination.  *See* 30(b)(6) Deposition at 41.[2]

This dynamic leaves HMI in an odd position.  HMI expects that PCIC may lodge *post hoc* rationales for its denial in its summary judgment response, a posture that would fall outside permitted claims-handling practices and federal procedure.  *See* ORS 746.230(m) (requiring an insurer "to promptly provide the proper explanation of the basis relied on in the insurance policy in relation to the facts or applicable law for the denial of a claim"); *Kennedy v. Allied Mutual Ins. Co.,* 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting [] prior deposition testimony.").  That said, after years in the dark and several failed attempts, HMI recently took PCIC's deposition, which shed light on the coverage landscape.  The coverage facts are now settled on three critical points.

First, PCIC agrees that the manifestation coverage grant[3] of the 2010-11 policy is satisfied, at least as to one "occurrence."  30(b)(6) Deposition at 140 ("[O]nce the job was completed sometime in 2010 is when the manifestation occur[ed]").  Second, while PCIC declined to commission an expert report or pay a trial expert[4] on HMI's behalf in the Underlying

---

[2] PCIC, at its corporate deposition, noted there was "no decision made relative to indemnity."
[3] "Coverage grant" refers to an insurance policy's affirmative extension of coverage to the insured.
[4] As detailed below, an expert was retained on HMI's behalf, likely by defense counsel, in the Underlying Lawsuit but, PCIC failed to pay HMI's expert and acknowledges that HMI may have had no trial expert.  *See generally* 30(b)(6) Deposition at 105-06, 142-43.

Page 5 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

Lawsuit or on PCIC's own behalf in this action, HMI's expert report makes clear that the

coverage grant of the 2009-10 policy is satisfied on a similar factual basis as the 2010-11 grant.

*See* Expert Report at 1-2.  Third, while PCIC cited numerous exclusions[5] and policy limitations

as affirmative defenses (Dkt. 18, page 6), PCIC states under oath that it cannot *to this day*

identify a factual basis to apply these exclusions and limitations to the liability adjudged against

HMI in the Underlying Lawsuit.  30(b)(6) Deposition at 78 (PCIC was asked, "[w]hich

[Underlying Lawsuit] damages were covered and which damages were not?"  PCIC responded

that it does not know.).

Practically, therefore, on insurance coverage the parties are not as far apart as this

protracted litigation suggests.  Given the relative agreement of the parties concerning satisfaction

of the coverage grant, the analysis of the sole expert witness in the case that the coverage grants

of the 2009-10 and 2010-11 policies are satisfied, and the fact that after the close of discovery

PCIC can articulate no basis for the application of a policy exclusion, HMI moves for summary

judgment on its breach of contract claim.  In addition to the three points noted above, HMI also

moves for a finding of two policy-defined "occurrences" in each of these two policy years,

coverage more than sufficient to cover the judgment entered against HMI in the Underlying

Lawsuit.[6]

For reference, HMI sets out the coverage grants and policy-defined "occurrence,"

provisions upon which HMI bears the persuasive burden.  The 2009-10 policy grant states, in

relevant part, as follows:

> We [PCIC] will pay those sums that the insured [HMI] becomes legally obligated
> to pay as damages because of "bodily injury" or "property damage" to which this

---

[5] "Exclusions" are provisions that remove or limit aspects of liability from the coverage grant.
[6] HMI reserves all rights under PCIC's 2011-12 and 2012-13 policies.

Page 6 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . . .

This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory" [and]

(2) The "bodily injury" or "property damage" *first manifests and appears* during the **Term.** This coverage does not apply to any "bodily injury" or "property damage" that is continuous in nature, progressively deteriorating, results from repeated exposure to the same causal agent, and/or that first manifests prior to the Inception Date, even if such "bodily injury" or "property damage" continues into the **Term** whether or not it is known to any insured. . . .

Schulze Dec., Ex. 1, Page 7 (Dkt. 36-2) (emphases added). The 2010-11 policy language is

substantively similar but with minor differences:

The "bodily injury" or "property damage" first takes place in fact or manifests during the policy period and is caused by an accident that takes place during the policy period. This coverage does not apply to any "bodily injury" or "property damage" that first takes place in fact or manifest prior to the Inception Date, even if it is presumed in law or fact to be continuous in nature, progressively deteriorating, to result from continuous or repeated exposure to substantially the same harmful conditions, and even if such "bodily injury" or "property damage" continues into the policy period, or is presumed by law to continue into the policy period.

Schulze Dec., Ex. 2, Page 7 (Dkt. 36-3). Under both policies, "'[o]ccurrence' means an accident,

including continuous or repeated exposure to substantially the same general harmful conditions."

*Id.* at page 27.

As to the various policy exclusions and limitations raised as affirmative defenses in

PCIC's Answer, PCIC generally stated under oath that it does not know whether and the extent

to which these policy restrictions could bar coverage. *See e.g.* 30(b)(6) Deposition at 130.

(Question: "[T]oday PCIC does not know which work is barred by this exclusion?"; Answer:

"That is correct."). HMI cannot reasonably be made to resist the exclusions' application given

Page 7 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

that PCIC bears the associated burden and swears under oath that it knows of no factual basis to

apply its exclusions (with one exception noted below) to the damages awarded against HMI.  *See*

*Employers Ins. of Wausau v. Tektronix, Inc.,* 211 Or. App. 485, 509, 156 P.3d 105 (2007)

("[T]he insurer has the burden of proving that the policy excludes coverage.").  That said, PCIC

provided an ostensible albeit legally unavailing basis for raising the policies' ongoing operations

exclusions, and HMI thus responds to that argument herein.

### C.    Legal Standards

#### 1.    Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact

and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

initial burden is on the moving party to point out the absence of any genuine issue of material

fact.  Once the initial burden is satisfied, the burden shifts to the non-moving party to

demonstrate through the production of probative evidence that there remains an issue of fact to

be tried.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  In that

situation, there is no genuine issue as to any material fact "since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial."  *Id.* at 323.  There is also no genuine issue of fact if, on the record taken as a whole,

a rational trier of fact could not find in favor of the party opposing the motion.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L. Ed. 2d 538

(1986); *Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989).

Page 8 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

###           2.        Oregon Rules of Policy Interpretation

Under Oregon law, insurance policies are interpreted from the "the perspective of the 'ordinary purchaser of insurance.'" *North Pac. Ins. Co. v. Am. Mfrs. Mut. Ins. Co.*, 200 Or. App. 473, 478, 115 P.3d 970 (2005). Undefined policy terms are generally given their ordinary and common meaning. *Mutual of Enumclaw Ins. Co. v. Rohde*, 170 Or. App. 574, 579, 13 P.3d 1006 (2000). Oregon courts refer to dictionary definitions when looking for the plain and ordinary meaning of undefined terms in insurance policies. *See*, *e.g.*, *Gonzales v. Farmers Ins. Co. of Oregon*, 210 Or. App. 54, 60, 150 P.3d 20 (2006).[7]

Where policy terms are unambiguous, they are enforced as written. *Groshong v. Mut. of Enumclaw Ins. Co.*, 329 Or. 303, 308, 985 P.2d 1284 (1999). However, where policy terms are susceptible to more than one interpretation, Oregon courts undertake a sequence of analytical steps to determine the meaning of the language. *Hoffman Constr. Co. v. Fred S. James & Co. of Or.*, 313 Or. 464, 469-71, 836 P.2d 703 (1992). Courts first determine whether the competing interpretations are plausible when viewed in light of the immediate context of the policy language and in the broad context of the policy as a whole. *Id.* If only one interpretation continues to be reasonable after contextual review, that interpretation controls. *Id.* If, however, both interpretations continue to be reasonable, the policy language is deemed ambiguous and construed in favor of coverage for the insured. *Id.*

In other words, the insurer can only prevail by demonstrating that its interpretation is the *only* reasonable one and that the policy cannot be read any other way. *See Hoffman,* 313 Or. at

---

[7] *See also Mid-Century Ins. Company v. Perkins*, 209 Or. App. 613, 632-633, 149 P.3d 265 (2006); *Tualatin Valley Housing Partners v. Truck Ins. Exchange*, 208 Or. App. 155, 160, 144 P.3d 991 (2006); *Schnitzer Investment Corp. v. Certain Underwriters at Lloyd's of London*, 197 Or. App. 147, 156-157, 104 P.3d 1162 (2005).

Page 9 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

471.  Conversely, "[i]f the insured offers a [] plausible and reasonable interpretation of the insurance policy, that interpretation governs regardless of whether the insurer offers a different interpretation that is also plausible and reasonable."  *Alkemade v. Quanta Indemnity Co*., 687 Fed. Appx. 649, 651 (9th Cir. 2017) ).

> As Judge Mosman put it:
>
> Now, Valiant [the insurer] is probably the winner of the argument in one sense: at some intuitive level, its interpretation of the policy definition seems better than Konell's. In a popularity contest, Valiant's interpretation might win most of the time. But this court's task, under governing law, is not to choose the better of two interpretations. When the policy is reasonably susceptible to more than one interpretation-and this one is at least on these facts-then it should be construed against the drafter.

*Konell Construction & Demolition Corp. v. Valiant Ins. Co.*, No. 03-412, 2006 WL 1360956, *4 (D. Or. May 15, 2006).

Within this framework, other interpretive principles are at play, as well.  Under Oregon law, the Court must give the policy "a liberal construction as favorable to the insured as in good conscience will be permitted, and every reasonable intendment will be allowed in support of a view that will protect the insured and defeat a forfeiture."  *Land v. West Coast Life Ins. Co.*, 201 Or. 397, 401, 270 P.2d 154 (1954).  Policy grants are liberally construed, whereas exclusions are strictly construed against the insurer.  *Collins v. Farmers Ins. Co. of Oregon* , 312 Or. 337, 357, 822 P.2d 1146 (1991); *Tektronix, Inc.,* 211 Or. App. at 509.  Because insurers have unfettered power to draft policy language as they see fit, courts burden them with the consequences of poor drafting.  *See N. Pac. Ins. Co. v. Hamilton*, 332 Or. 20, 29, 22 P.3d 739 (2001). ("It is the insurers' burden to draft exclusions and limitations that are clear" and "the court does not permit the party who drafted the term or phrase to benefit from the obscurity").

Also, a proposed interpretation of a term that may be plausible in isolation is not reasonable if it would render another term redundant or meaningless.  *Hoffman*, 313 Or. at 471.[8]

> **D.    HMI is entitled to summary judgment on its contract claim as it performed two separate scopes of work with each constituting a separate "occurrence" resulting in covered "property damage."**

HMI addresses the four policy limits to which it is entitled below, starting with the damage resulting from HMI's work on the Project's windows and siding.

> **1.    PCIC concedes coverage of damage resulting from HMI's work on windows and siding under the 2010-2011 policy, entitling HMI to a per-"occurrence" limit of $1,000,000.**

As noted above, PCIC swears under oath that the 2010-11 manifestation coverage grant is satisfied as to the windows and siding.

> PCIC:   In this case, the -- there was no indications that there was manifestation until 2010.  The job took place between 2007 and 2010, and *once the job was completed sometime in 2010 is when the manifestation occur[red]*. . . .

> HMI:   Okay.  But there was a manifestation during the 2010 policy.  Correct?

> PCIC:   It appears that that's when these -- these signs of damages first appeared.

30(b)(6) Deposition at 139-40 (emphasis added).  Pursuant to the federal rules of civil procedure, PCIC's sworn statements are binding.  *See Kennedy,* 952 F.2d at 266 ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting [] prior deposition testimony."); *see also Memory Integrity, LLC v. Intel Corp*., 308 F.R.D. 656, 661 (D. Or. 2015) (An FRCP 30(b)(6) designee "give[s] complete, knowledgeable and binding answers on behalf of the corporation." (internal quotes omitted)); *Dairyland Power Coop. v. United*

---

[8] The legal standards applicable to HMI's breach of fiduciary duty claim are discussed below in **Section E(1).**

*States*, 79 Fed. Cl. 709, 714 (2007) (same proposition); *Reilly v. NatWest Mkts. Group, Inc*., 181 F.3d 253, 268 (2d Cir. 1999) (same).

For what it is worth, HMI's expert agrees with PCIC's assessment that window and siding-related damage manifested in the 2010-11 policy period.  *See* Expert Report at 3-4.  Thus no dispute exists on this critical aspect of coverage, satisfying the coverage grant in this second PCIC period.  Further, PCIC does not challenge that at least $1 million of liability, the per-"occurrence" limit, could be attributable to damage manifesting in the 2010-11 period from HMI's window/siding work.  30(b)(6) Deposition at 140 (PCIC conceding it does not know "how much of HMI's liability in this case arose out of damage that manifested in 2010"); *see also Fountaincourt Homeowners' Ass'n v. Fountaincourt Dev., LLC*, 264 Or. App. 468, 488, 334 P.3d 973 (2014), *aff'd* 360 Or. 341 (2016) (Once the coverage grant is satisfied, "it f[alls] to [the insurer] to establish that some portion of the damages included in the judgment did not reflect property damage occurring during its policy period.").  This is hardly surprising given that HMI completed its work in the 2010-11 policy period, faced liability in "excess of $10 million," *see* Expert Report at 4, and was adjudged liable for $2.5 million.[9]

PCIC also concedes that it cannot meet its burden of demonstrating the applicability of the various policy exclusions raised as affirmative defenses.  *See* Dkt. 18, page 6 (listing affirmative defenses).  As to the policy exclusions raised, PCIC was asked at its corporate deposition, to the effect, "today PCIC does not know which work [for which HMI was held liable] is barred by this exclusion?"  *See e.g.* 30(b)(6) Deposition at 130.  PCIC repeatedly

---

[9] In the words of *Fountaincourt*, at least $1 million "of the damages awarded could have been for property damage sustained during [the 2010-11] policy period."  264 Or. App. at 488; *see also Fountaincourt Homeowners' Ass'n v. Fountaincourt Dev., LLC*, 360 Or. 341, 365, 380 P.3d 916 (2016) (As a matter of law, the insured is not "required to prove the precise amount of damages that occurred during the policy period.").

Page 12 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

answered in the negative, with just one relevant exception (discussed below), stating it knew of no factual basis upon which to apply its exclusions to the damages awarded against HMI. *See e.g. id.* at 127, 128, 130, 132, 133, 136, etc.

Notably, PCIC has had nearly four years to come up with something, from the opening of HMI's claim file in November 2015 to PCIC's corporate deposition in October 2019--this despite receiving deposition notices with a full list of topics in April, May, June, July, and October of this year.  Kolta Dec., Paragraph 8 and Ex. 6.  Yet, PCIC is *still* unable to apply its exclusions to the damages awarded against HMI and its sworn lack of knowledge is its final word:  "[T]he entity is not allowed to defeat a motion for summary judgment based on an affidavit that conflicts with its Rule 30(b)(6) deposition or contains information that the Rule 30(b)(6) deponent professed not to know."  *Snapp v. United Transportation Union*, 889 F.3d 1088, 1103 (9th Cir. 2018) (quoting 7 James Wm. Moore et al., *Moore's Federal Practice* § 30.25[3] (3d ed. 2016)), *cert. denied sub nom. Snapp v. Burlington N. Santa Fe Ry. Co.*, No. 18-567, 2019 WL 113164 (U.S. Jan. 7, 2019); *see also Wausau Underwriters Ins. Co. v. Danfoss, LLC*, 310 F.R.D. 683, 687 (S.D. Fla. 2015) ("apply[ing] the general rule that a Rule 30(b)(6) deponent's answers bind the entity" to hold that a corporate representative's "'I don't know' answers" are "deemed fully binding," and entity "may not proffer any testimonial evidence regarding [its] collective position on the notice topics contrary to or in addition to what [its Rule 30(b)(6) designee] answered on [its] behalf").  PCIC thus bindingly concedes no genuine issue of fact remains in dispute as to all but one of its exclusions.

The exception noted above is as to the Ongoing Operations exclusion, which PCIC states applies to HMI's liability under all policies because it "excludes coverage for operations not disclosed to the insurer in applying for insurance."  30(b)(6) Deposition at 137.  This assertion is

Page 13 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

equal parts perplexing and misplaced.  First, the 2009-10 and 2010-11 Ongoing Operations

exclusions are identical, and neither contains even a passing mention of the policy application or

operations disclosed therein,[10] rendering PCIC's purported basis for raising the Ongoing

Operations exclusions a non-starter.  *See* ORS 742.016 ("Every contract of insurance shall be

construed according to the terms and conditions of the policy.").

Second, even if this argument were supported by PCIC's chosen policy language, PCIC's

reliance on the policy applications is impermissible under Oregon law because the applications

were not attached to the insurance policy when issued.  *See* Bauer Declaration in Support of

HMI's Motion for Summary Judgment, Paragraph 6 ("None of HMI's policy applications were

attached to, delivered with, or otherwise issued with the above-listed policies.").[11]  Thus,

---

[10] **EXCLUSION – DESIGNATED ONGOING OPERATIONS**. . .

**SCHEDULE**

**Description of Designated Ongoing Operation(s):**
Any and all locations and operations. . . .

Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY
(Section **I** – Coverages):
This insurance does not apply to "bodily injury" or "property damage" arising out of the ongoing
operations described in the Schedule of this endorsement, regardless of whether such operations are
conducted by you or on your behalf or whether the operations are conducted by yourself for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such
operations are conducted by you or on your behalf.  If a specific "location" is designated in the
Schedule of this endorsement, this exclusion applies only to the described ongoing operations
conducted at that "location."

For the purpose of this endorsement, "location" means premises whose connection is interrupted only
by a street, roadway, waterway or right-of-way of a railroad.

Schulze Dec., Exs. 2 & 3 (Dkt. 36-2, 36-3), pages 83 and 88, respectively.
[11] An insurer cannot purport to rely on statements in an application unless "the application is
indorsed upon or attached to the insurance policy when issued."  ORS 742.013(1)(a).  PCIC
produced the as-issued policies in this case separately from their respective applications.  For
example, PCIC produced the 2009-10 policy with Bates numbers PCIC000774 to 857 and the

Page 14 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

pursuant to ORS 742.013,[12] PCIC's reliance on the applications is expressly prohibited.  *See Brock v. State Farm Mut. Auto. Ins. Co.*, 195 Or. App. 519, 528-29, 98 P.3d 759 (2004) ([T]he insurer could avoid coverage based on misrepresentations in the application if the material information was reproduced on the policy itself.").

Furthermore, to sustain an argument under ORS 742.013, the statements on the applications must also be "shown by the insurer to be material, and the insurer [must] also show[] reliance thereon."  ORS 742.013(1)(b); *see also Eslamizar v. American States Ins. Co.*, 134 Or. App. 138, 894 P.2d 1195 (1995) (interpreting substantively identical language in ORS 742.208(3) to require insurer to provide specific evidence of materiality and reliance to deny coverage based on statements in policy application).  PCIC cannot meet this burden after issuing four consecutive policies between 2009 and 2013 without so much as requesting an updated list of HMI's active construction projects upon three policy renewals.  30(b)(6) Deposition at 138 (PCIC never inquired as to whether "HMI was performing work on any other projects," and, yet, "renewed the policy for four consecutive years").  As a final note, PCIC is of two minds as to whether the Ongoing Operations exclusions apply in the first place, stating under oath that it does not know "[w]hich [of HMI's] damages were covered and which damages were not." 30(b)(6) Deposition at 78.

In sum, PCIC acknowledges that the 2010-11 coverage grant is satisfied as to at least one "occurrence," and PCIC concedes under oath that it cannot carry its exclusionary burden.  Thus,

---

associated application was produced as PCIC001052 to 1069.  Thus PCIC's own file demonstrates that the application was not attached to the policy.

[12] ORS 742.013 provides, in relevant part, that "[m]isrepresentations, omissions, concealments of facts and incorrect statements shall not prevent a recovery under the policy unless the misrepresentations, omissions, concealments of fact and incorrect statements:  Are contained in a written application for the insurance policy, and *a copy of the application is indorsed upon or attached to the insurance policy when issued*."  Emphasis added.

Page 15 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

at a bare minimum, there is no disputed issue of material fact as to the $1,000,000 per-

"occurrence" limit under PCIC's 2010-11 policy, and HMI is entitled to judgment thereon.

> **2.    The 2009-2010 policy period is also triggered by damage resulting from HMI's work on the siding and windows.**

PCIC's corporate designee was not aware of manifestation of damage within the 2009-10

policy period.  However, this appears but a natural result of PCIC's perfect lack of attention to

the matter, failing to fund an expert analysis[13] to protect HMI in the Underlying Lawsuit and to

retain an expert on PCIC's own behalf in this coverage action.  HMI's unrebutted expert fills in

this gap, finding the damage at each building "manifested soon after the installation [between

February 2009 and August 2010][14] of the windows . . . and the adjacent siding [with the damage]

developing the first winter after installation at each building at the latest."  Expert Report at 4.

"While this damage was initially masked by replacement siding, it would have been readily

discoverable upon reasonable inspection."  *Id.*[15]  To evaluate whether this property damage

triggers coverage in the 2009-10 period, one must first interpret PCIC's unique coverage grant.

In relevant part, the 2009-10 grant is triggered when "'property damage' *first manifests

and appears* during the **Term**."  Schulze Dec., Ex. 1, Page 7 (Dkt. 36-2) (Emphasis added).

Pursuant to *Hoffman Construction*, these critical terms must first be interpreted according to their

---

[13] While an expert was retained, apparently by defense counsel, the expert was not prepared for trial due to PCIC's failure to pay him for his services, leading to an outstanding bill of $30,000 on the eve of trial.  Claims Notes at 30.  At its corporate deposition, PCIC confirmed that it failed to pay HMI's expert, could not explain this critical omission, and conceded that "PCIC [did] not know whether . . . the insured would have had a[] [trial] expert to opine on damages."  30(b)(6) Deposition at 105-06, 142-43.
[14] PCIC does not dispute that HMI conducted its work on the Project in both the 2009-10 and 2010-11 policy periods.  *See* 30(b)(6) Deposition at 130.
[15] It goes without saying that work performed by HMI on distinct buildings *after* February 20, 2010 could not have resulted in "property damage" for which HMI was liable during the February 20, 2009-10 period.  *See Alkemade*, 687 Fed. Appx. at 653 ("[N]ot all property damage counts under the policy. Only a subset of property damage for which [the insured] is liable is eligible for coverage.").

Page 16 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

plain meaning.  As to the plain meaning of "manifest," the District Court of Virginia has

extensively and instructively evaluated the term in reliance upon its dictionary definition in

accordance with *Hoffman Construction*:

> According to Webster's Third New International Dictionary, for example, "to manifest"
> means "to show plainly: [to] make palpably evident or certain by showing or displaying."
> Webster's Third New International Dictionary 1375 (1993). It further defines the
> adjective "manifest" as "capable of being readily and instantly perceived by the senses
> and esp[ecially] by sight: not hidden or concealed: open to view," or "capable of being
> easily understood or recognized at once by the mind: not obscure: obvious," or "being the
> part or aspect of a phenomenon that is directly observable." *Id.* And Black's Law
> Dictionary defines the term to mean "[e]vident to the senses, especially to the sight,
> obvious to the understanding, evident to the mind, not obscure or hidden," and to be
> "synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evident,
> and self-evident." Black's Law Dictionary 867 (5th ed. 1979). Other courts, including the
> Fourth Circuit, moreover, have defined "manifest" in the insurance context to mean
> "readily perceived or obvious." It appears, therefore, that the term "manifest" has
> multiple-albeit subtle-variations in meaning.
> . . .
>  Further scrutiny of the term "manifest" reveals that the range of meaning it supports is
> bounded and unified by a focus on the nature of the manifesting phenomenon.
> Specifically, "manifest," in all of its forms, connotes the self-revelation of the
> manifesting phenomenon and its *ability* to be perceived-that is, something manifests itself
> by becoming sufficiently susceptible to apprehension or comprehension. The term
> inquires into whether a phenomenon is of a sufficiently external nature as to be "readily
> perceived," and it is not necessary under any variation of the term's meaning that the
> manifesting phenomenon *actually be perceived or discovered.* Rather, as with all
> phenomena that are in themselves manifest, perception or discovery requires an
> affirmative act of looking or otherwise taking whatever reasonable steps are required to
> perceive the manifesting phenomenon; a phenomenon's objective manifestation occurs
> independent of another's perception.  In other words, "manifest," in this sense,
> means *discoverable* or subject to being discovered by reasonable means, not
> actually *discovered* or perceived.

 *Morrow Corp. v. Harleysville Mut. Ins. Co*., 110 F.Supp.2d 441, 449-50 (E.D. Va. 2001)

(internal footnotes omitted and emphasis in original).  Thus, according to Webster's Third New

International Dictionary, "manifest" connotes "a range of meaning," which includes both

*discovered* damage, damage "open to view" and "show[n] plainly," and *discoverable* damage,

damage "*capable* of being readily and instantly perceived by the senses and esp[ecially] by

sight."  Similarly, "appear" is defined, in relevant part, as to "be visible," "be manifest," and "to

Page 17 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

come into existence."  Webster's Third New International Dictionary 103 (1993).  Thus damage

can "appear" without regard to whether it has been subjectively observed.

The plain meaning of the phrase "first manifests and appears" reasonably captures the

"readily discoverable" damage that began during the February 2009-10 period.  Proceeding to

the second, contextual step of the *Hoffman Construction* analysis, the coverage grant excludes

from coverage "'property damage' . . . that first manifests prior to the Inception Date, even if

such . . . 'property damage' continues into the **Term** *whether or not it is known to any insured*."

Schulze Dec., Ex. 1, Page 7 (Dkt. 36-2) (Emphasis added).  This exclusionary phrase reaffirms

that "property damage" can "first manifest[] . . . whether or not it is known to any insured."

Conversely, if only known, discovered damage fell within the grant, this exclusionary phrase

would be rendered meaningless.  *See Hoffman Construction*, 313 Or. at 472 ("We assume that

parties to an insurance contract do not create meaningless provisions.").  The context in which

the phrase "first manifests and appears" is used, therefore, reaffirms the interpretation that the

coverage grant includes "property damage" that is readily discoverable even if it has not yet been

discovered.

The insured submits that its proposed interpretation is the only reasonable interpretation

of the trigger language in the 2009-10 coverage grant.  However, even if PCIC were to propose a

countervailing, reasonable interpretation, the insured's interpretation would control pursuant to

*Hoffman Construction.  See Alkemade*, 687 Fed. Appx. at 651 (Applying *Hoffman Construction*

and finding "[i]f the insured offers a [] plausible and reasonable interpretation of the insurance

policy, that interpretation governs regardless of whether the insurer offers a different

interpretation that is also plausible and reasonable").  With coverage thereby triggered in both

2009-10 and 2010-11, the question becomes one of allocation.

Page 18 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

The Oregon Court of Appeals and Supreme Court answered this allocation question in *Fountaincourt Homeowners' Ass'n*.  In *Fountaincourt*, the garnishor, standing in the shoes of the insured, provided expert testimony that "water damage . . . began in the fall or winter after the work was done."  *Fountaincourt Homeowners' Ass'n v. Fountaincourt Dev., LLC*, 360 Or. 341, 365, 380 P.3d 916 (2016).  The garnishor's expert further "opined that it was not possible to quantify how much of the consequential water damage occurred during which insurance policy period."  *Id.*

The Oregon Supreme Court found that this showing of damage within the relevant policy periods satisfied the insured's burden, holding the insured was not "required to prove the precise amount of damages that occurred during [each] policy period."  *Id.* at 365.  With the insured's burden thereby satisfied, "it fell to [the insurer] to establish that some portion of the damages included in the judgment d[o] not reflect property damage occurring during [the triggered] policy period." *Fountaincourt Homeowners' Ass'n v. Fountaincourt Dev., LLC*, 264 Or. App. 468, 488, 334 P.3d 973 (2016), *aff'd by* 360 Or. 341 (2016); *see also State v. Zurich Specialties London Ltd.*, 116 Wash. App. 1033, 2003 WL 1824966, *5 (2003) (placing burden on insurer to establish a factual basis to allocate a damages award arising out of covered and uncovered time periods); *Tektronix, Inc.,* 211 Or. App. at 509 ("[T]he insurer has the burden of proving that the policy excludes coverage.").

Here, the undisputed record shows that the "property damage," akin to that in *Fountaincourt*, "develop[ed] the first winter after installation at each building at the latest." Expert Report at 3-4.  Pursuant to *Fountaincourt*, PCIC bears the burden "to establish that some portion of the damages included in the judgment d[o] not reflect property damage occurring during [the triggered] policy period[s]."  PCIC formally concedes it cannot meet this burden as it

Page 19 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

is unable to allocate the property damage amongst its applicable policy periods.  30(b)(6)

Deposition at 140.[16]  Thus no issue of material fact remains in dispute as to whether the damages

awarded against HMI satisfy PCIC's coverage grants.  HMI is, therefore, entitled to judgment of

$2,000,000 on liability resulting from siding and windows, one $1,000,000 per-occurrence limit

per implicated policy period.

### 3. In each of the 2009-2010 and 2010-2011 policy periods, an additional, covered "occurrence" arose from HMI's separate scope of work on the attic venting.

The record in the Underlying Lawsuit establishes that HMI was also adjudged liable for

its defective attic venting work.  Keyway's third-party complaint against HMI alleged "property

damage resulting from . . . roof ventilation."  Dkt. 17-2 at page 4.  Underlying plaintiff's demand

further elaborated that "HMI's negligent installation of ducting and mechanical venting was a

major cause of property damage to the roofs and attics" and that "deposition testimony . . .

unequivocally established that HMI installed many of [these components]."  Kolta Dec., Ex. 4 at

HMI_0114378, 85.  Defense counsel reported similarly – "Several witnesses testified that an

HMI crew picked up [the bathroom venting fan] work."  Baran Pre-Trial Report at

HMI_0114405.  The below photo is demonstrative of the underlying claims concerning HMI's

venting work:

/ / /

/ / /

/ / /

/ / /

---

[16]Specifically, when asked, "how much of HMI's liability in this case arose out of damage that manifested in 2010," PCIC responded, "[t]hat's not clear.  [PCIC doesn't] know."

Page 20 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT



Expert Report at 6.

Had PCIC desired to challenge HMI's role in the attic damage, it could have done so via

its defense of HMI in the Underlying Lawsuit by challenging the alleged scope/nature of HMI's

work, taking an active role in settlement negotiations, and/or retaining a trial expert to analyze,

testify, and protect HMI on this issue.  PCIC did none of these things, and it cannot now escape

its deficient defense in the Underlying Lawsuit by purporting to relitigate the nature of HMI's

liability in this coverage action (to the exclusive detriment of the insured whose interests it was

charged to protect).  *See FountainCourt*, 360 Or. at 357 ("[A]n insurer cannot, in a subsequent

proceeding, retry its insured's liability, or alter the nature of the damages awarded.").[17]

---

[17] The question for the Court here is "a matter of contract law – what, precisely, the insured has
become legally obligated to pay as damages in the prior proceeding." *Id.* at 357.

Page 21 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

As to when the attic damage manifested, HMI performed its "defective/improper bath fan, dryer vent, and kitchen hood exhaust work . . . between February of 2009 and October of 2010." Expert Report at 1. "Water damage began to occur the first winter after the completion of the defective [vent] relocation work and thereafter resulted in extensive leaks throughout the complex." *Id.* at 3; *see also Fountaincourt*, 360 Or. at 365 (finding insured is not"required to prove the precise amount of damages that occurred during [each] policy period").

Thus, pursuant to HMI's unrebutted expert analysis, the attic damage for which HMI was held liable first manifested during the February 2009-10 and 2010-11 policy periods,[18] and PCIC concedes that it does not know if or the extent to which its exclusions apply. *See* 30(b)(6) Deposition at 126-36. The only additional coverage provision at issue on this aspect of indemnity coverage is the extent to which HMI's liability arising from this distinct scope of work constitutes a second "occurrence" in each of the policy periods.

The policies provide that "'[o]ccurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Schulze Dec., Ex. 2, Page 7 (Dkt. 36-3). In cases such as this, where the liability facts are established, whether property damage is caused by an accident or "occurrence" presents a purely legal question. *See St. Paul Fire & Marine Ins. Co., Inc. v. McCormick & Baxter Creosoting Co.*, 324 Or 184, 192, 923 P2d 1200 (1996) (interpreting and applying various "occurrence" terms as a matter of law). Courts in Oregon find as a matter of law that the "occurrence" is the defective construction itself, as is the exposure to conditions it creates. *Valley Forge Ins. Co. v. American Safety Risk*

---

[18] Again, it goes without saying that work performed by HMI on distinct buildings *after* February 20, 2010 could not have resulted in "property damage" for which HMI was liable during the February 20, 2009-10 period. *See Alkemade*, 687 Fed. Appx. at 653 ("[N]ot all property damage counts under the policy. Only a subset of property damage for which [the insured] is liable is eligible for coverage.").

Page 22 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

*Retention Group, Inc.*, No. CV-05-71-HU, 2006 WL 314455, *6 (D Or Feb. 9, 2006) ("The construction defects at issue in the underlying litigation are properly considered as . . . occurrences.").

Tracking the definition of "occurrence," the "accident" of the defective venting is entirely distinct from the "accident" of the defective windows/siding work.  The attic damage arose from the "accident" of HMI's failure to properly install venting ducts through the attics and roofs.  Kolta Dec., Ex. 4 at HMI_0114378-79, HMI_0114385-86.  In contrast, the window/siding damage arose from the "accident" of HMI's failure to properly install windows and identify/ repair adjacent rot.  *Id.* at HMI_0114377-85.

Returning to the "occurrence" definition, the "exposure[s] to . . . harmful conditions" at issue here are distinct.  The "harmful condition" in the attics was excessive humidity interacting with the roofs during cold weather, resulting in condensation, which accumulated and caused damage, initially within the attics and then to the interior spaces via leaks through the ceiling.  *Id.* at HMI_0114385-86; Expert Report at 3.  In contrast, the "harmful condition" to the siding/windows was water intrusion penetrating the building exteriors via rain and wind.  Kolta Dec., Ex. 4 at HMI_0114377-85; Expert Report at 4.

Thus both the construction defects themselves (the "accidents") and the "harmful conditions" in which they resulted were distinct, and each scope of work constituted a separate "occurrence' pursuant to the policies' plain language.  *See generally First Financial Ins. Co. v. Reeves*, No. B148399, 2002 WL 661564 (Cal. App. Apr. 23, 2002) (finding water leaks arising from distinct construction defects and causing damage to distinct building components constituted separate "occurrences").  The insured submits that its proposed interpretation of "occurrence" is the only reasonable interpretation.  However, even if PCIC were to propose a

Page 23 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

countervailing, reasonable interpretation, the insured's interpretation would control pursuant to *Hoffman Construction.  See Alkemade*, 687 Fed. Appx. at 651.

With two "occurrences" established in each of PCIC's first two policy periods and an associated $4 million in available coverage, the $2.5 million judgment is fully covered, and HMI is entitled to summary judgment on its breach of contract claim.

**E.    HMI is also entitled to summary judgment on its bad faith breach of fiduciary duty claim.**

**1.    Oregon's legal standards governing claims handling.**

Under Oregon law, a defending insurer has a duty of good faith to its insured, often referred to as a fiduciary duty.  An insurer's fiduciary duty to its insured under Oregon law is clear cut and long-standing.  *See Farris v. USF&G*, 284 Or. 453, 460 n.2, 587 P.2d 1015 (1978) (The "classification of an insurer as a 'fiduciary' when deciding whether or not it should settle within the policy limits is so prevalent as to not require citation to authority.").

> An insurer owes to its insured the duty of due diligence and good faith. In determining whether to settle claims against the insured, the insurer must act as if it were liable for the entire judgment that might eventually be entered against the insured. In addition, *only a decision made by an insurer who exercises due diligence in apprising itself of the material facts is entitled to be considered as made in good faith.*

*Maine Bonding & Casualty Co. v. Centennial Ins. Co.*, 298 Or. 514, 518 (1985) (quoting *Kuzmanich v. United Fire and Casualty*, 242 Or. 529, 532, 410 P.2d 812, 813 (1966) (emphasis added)).

As to the nature of a fiduciary duty, Judge Cardoza famously noted long ago and the Oregon Supreme Court more recently reiterated:

> Many forms of conduct permissible in a workaday world for those acting at arm's length[] are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the

Page 24 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

> *punctilio of an honor* the most sensitive, is then the standard of behavior.  As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions * * *. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.  It will not consciously be lowered by any judgment of this court.

*Klinicki v. Lundgren*, 298 Or. 662, 684, 695 P.2d 906, 920-21 (1985) (quoting *Meinhard v. Salmon,* 249 N.Y. 458, 463–64, 164 N.E. 545, 546 (1928)) (emphasis added).

> Good faith requires the insurer, in handling negotiations for settlement, to treat the conflicting interests of itself and the insured with impartiality, giving equal consideration to both interests. With respect to settlement and trial, an insurance company must, in the exercise of good faith, act as if there were no policy limits applicable to the claim and as if the risk of loss was entirely its own. Bad faith is normally demonstrated by proving that the risks of unfavorable results were out of proportion to the chances of a favorable outcome.

*Maine Bonding & Casualty Co.*, 298 Or. at 518 (quoting *Eastham v. Oregon Auto Ins. Co.*, 273 Or. 600, 607, 540 P.2d 364, 367 (1975)).

Overall, "[t]he insurer's duty is best expressed by an objective test:  Did the insurer exercise due care under the circumstances."  *Id.* at 519.   Where "a liability insurer agrees to defend its insured against third-party claims, a failure to defend adequately is actionable at law." *Goddard v. Farmers Insurance Co. of Oregon*, 173 Or. App. 633, 637, 22 P.3d 1224 (2001). "The duty to defend includes the duty to settle the case within the policy limits if it would be reasonable to do so."  *Id.* (citing *Maine Bonding & Casualty Co. v. Centennial Ins. Co.*, 298 Or. 514, 519 (1985).  "[A]n insurer has an *affirmative* duty of care to its insured, which in an appropriate case requires the insurer to *initiate* settlement efforts."  *Id.* at 638 (emphases added).

> When a liability insurer undertakes to "defend," it agrees to provide legal representation and to stand in the shoes of the party that has been sued. The insured relinquishes control over the defense of the claim asserted. Its potential monetary liability is in the hands of the insurer. That kind of relationship carries with it a standard of care that exists independent of the contract and without

Page 25 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

reference to the specific terms of the contract. Therefore, [an insured's] excess claim can be brought as a claim for negligence.

*Georgetown Realty, Inc. v. Home Ins. Co*., 313 Or. 97, 110-11 (1992).[19]

As noted in *La Noue Development, LLC v. Assurance Co. of America*, "implicit in [the] holding" of *Safeco Inc. Co. of Am. v. Barnes*, 133 Or. App. 390, 397 (1995), "is that a breach of fiduciary duty for failing to settle may exist even in the absence of coverage." *La Noue Development, LLC v. Assurance Co. of America*, 2005 WL 1475599, *6 (D. Or. 2005). Thus, where a defending insurer has an opportunity to settle a case within policy limits and refuses to do so and the refusal exposes the insured to uncovered damages, the insurer's breach expands the scope of the insurer's duty beyond the confines of the insurance contract. *Kriz v. Government Employees Ins. Co*., 42 Or. App. 339, 347, 600 P.2d 496 (1979) ("It is well established that an insurer may be liable to its insured for the excess of a judgment over the limits of a liability policy if the insurer has failed, negligently or in bad faith, to settle the claim against the insured."); *see also Goddard ,*173 Or. App. at 637 (same proposition).

"To prevail in a claim for negligent or bad faith failure to settle within policy limits, an insured must prove: 1) that the insurer breached its duty of care to the insured, 2) causation and 3) damages." *Alexander Mfg., Inc. v. Illinois Union Ins. Co*., 666 F.Supp.2d 1185, 1207 (2009).

---

[19] This duty is further informed by Oregon's Unfair Settlement Practices Act, ORS 746.230. "Obedience to [ORS 746.230] is a component of [an insurer's] good faith obligation" to its insured. *Ivanov v. Farmers Ins. Co. of Oregon*, 344 Or. 421, 430, 185 P.3d 417 (2008). Among other things, ORS 746.230 specifically prohibits insurers from "[n]ot attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear," "[f]ailing to adopt and implement reasonable standards for the prompt investigation of claims," "[r]efusing to pay claims without conducting a reasonable investigation based on all available information," and "[f]ailing to promptly provide the proper explanation of the basis relied on in the insurance policy in relation to the facts or applicable law for the denial of a claim." To be clear, however, HMI does not predicate its claim on a private right of action under ORS 746.230.

Page 26 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

Ultimately, Oregon law imposes affirmative duties on an insurer, which include front and center:

1. "[O]nly a [settlement] decision made by an insurer who exercises due diligence in apprising itself of the material facts is entitled to be considered as made in good faith." *Maine Bonding & Casualty Co*., 298 Or. at 518.

2. "An insurer has an *affirmative* duty of care to its insured, which in an appropriate case requires the insurer to *initiate* settlement efforts." *Goddard*, 173 Or. App. at 638.

### 2. The undisputed factual background of PCIC's claim investigation and handling is characterized by (at best) omission.

PCIC's bare claim file, its lack of *any* effort to settle the Underlying Lawsuit, and its complete and utter failure to engage in this coverage action speak to a consistent theme of doing nothing in the hopes HMI will simply exhaust its patience and/or resources in pursuing its coverage entitlement. As detailed below, PCIC's claims-handling history is genuinely remarkable.

On January 8, 2016, PCIC[20] assumed HMI's defense in the Underlying Lawsuit. Kolta Dec., Ex. 5. On or about January 11, 2016, PCIC retained counsel to defend HMI. Kolta Dec., Ex. 7 at 17 ("Claim Notes"). Counsel then provided periodic updates to PCIC as the Underlying Lawsuit advanced through discovery, to mediation, through a global settlement (minus HMI), and approached trial. PCIC's claim file reflects defense counsel's updates along with those of HMI's personal counsel, Richard Senders, but little else. *Id.*

That said, the Underlying Lawsuit was steadily progressing to the above-mentioned global-minus-HMI settlement. On January 14, 2017, there was a preliminary mediation. Claim Notes at p. 5. This mediation was followed by a much more productive mediation on March 13, 2017. Kolta Dec., Ex. 8 at HMI_0114467. The following day, defense counsel reported to PCIC

---

[20] PCIC retained a third-party adjuster, Golden State Claims Adjusters, to handle HMI's claim.

Page 27 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

that underlying "plaintiff was considering entering a stipulated judgment with HMI, or settling around HMI so that it would be the only remaining defendant at trial." *Id.*

On or about March 15, 2017, PCIC retained coverage counsel. Kolta Dec., Ex. 9 at HMI_0114463. The following day, underlying plaintiff issued a detailed but time-limited settlement demand for $3 million to HMI. Kolta Dec. Ex. 4 at HMI_0114377-86. The settlement demand was set to expire on March 24, 2017. *Id.* at HMI_0114375. Underlying plaintiff computed its damages at $43.4 million and detailed the reasons that HMI would be held responsible for at least 20% of that amount if the case proceeded to trial. *Id.*

On March 21, 2017, defense counsel sent a pre-trial report to Christopher Kazarian, the claims-handler working on behalf of PCIC.[21] Baran Pre-trial Report at HMI_0114403-08. On March 22, 2017, Richard Senders, personal counsel for HMI, issued a separate pre-trial report to Mr. Kazarian. Kolta Dec., Ex. 10 ("Senders Pre-trial Report"), at PCIC000004-06. Defense counsel retained by HMI evaluated HMI's likely liability in light of underlying plaintiff's assertion of over $43 million in damages. Baran Pre-trial Report at HMI_0114403-08. Defense counsel opined that the risk of an adverse verdict against HMI was around 30%, and that HMI could be held responsible for up to 10% of adjudged damages. *Id.* at HMI_0114408. Thus defense counsel evaluated HMI's liability to be not less than $1.3 million (a 30% chance of liability for 10% of $43.4 million). *Id.*[22]

Personal counsel for HMI advised PCIC that its retained defense counsel's liability evaluation was overly optimistic: "HMI's potential for liability, especially for the defective installation of windows and bathroom fan vents, is much greater than Mr. Baran's estimate."

---

[21] Mr. Kazarian was employed by the third-party adjuster Golden State Claims Adjusters.
[22] While defense counsel also noted that third party plaintiff KeyWay provided a competing scope/bid, it was provided solely as a mediation communication.

Page 28 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

Senders Pre-trial Report at PCIC000004.  Personal counsel also pointed out that HMI's proposed legal defense, the loaned servant doctrine, was so uncertain that it had not merited a summary judgment motion, and that no trial expert had been retained for HMI, thereby requiring HMI, should trial proceed, "to rely primarily on KeyWay to challenge the amount of the plaintiff's damages."  *Id.*

Finally, personal counsel pointed out the obvious, that "[g]iven plaintiff's apparent damages claim of $43 million, even Mr. Baran's overly optimistic assessment places the risk to HMI in the range of two to three million dollars and, per Mr. Baran, there is roughly a one-third chance of such an outcome."  *Id.* at PCIC000005.  As underlying plaintiff's settlement demand was set to expire on March 24, 2017, personal counsel contacted PCIC's coverage counsel to encourage PCIC to accept the demand or at least make a counter-offer.  Kolta Dec., Ex. 11 at HMI_0114396 ("For [PCIC] to do nothing when it may have an opportunity to settle this case is wrong and leaves the insured in preventable peril.").

PCIC coverage counsel replied that "PCIC does not plan to fund acceptance of the [$3 million] offer."  *Id.* at HMI_0114395.  Coverage counsel also stated that "PCIC is actively evaluating the coverage for and merits of a [sic] this case[,] and we will be in touch with you shortly regarding our position with respect to a possible counteroffer."  *Id.*  While coverage counsel expressly represented that PCIC's coverage and liability/"merits" analyses of the case were incomplete, he contended that, at most, a single, per-occurrence limit of $1 million would apply to HMI's liability.  *Id.*  On March 24, 2017, underlying plaintiff withdrew its settlement demand as promised, noting "HMI has never extended any offer to settle the case or even indicated a willingness to do so at any time over the past 6 months."  Kolta Dec., Ex. 4 at HMI_0114375.

Page 29 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

About 10 days after receiving defense counsel and personal counsel's evaluations, both suggesting exposure over $4 million, and a week after PCIC suggested that $1 million in indemnity coverage was potentially available, HMI received a final settlement demand from third-party plaintiff KeyWay, offering to fully settle with and protect HMI for $1 million.  Kolta Dec., Ex. 12 at HMI_0114310.  HMI contacted PCIC to demand that it seize this settlement opportunity.  Kolta Dec., Ex. 13 at HMI_0114302 ("On behalf of HMI, I demand that PCIC agree to the amount of the settlement demand or some other mutually agreeable negotiated sum.").  PCIC declined to accept this settlement demand or make any counteroffer, stating it was "unable to respond substantively."  Kolta Dec., Ex. 14.  With PCIC "unable" to protect its insured just 12 days from trial and all other defendants settling, HMI was left in a no-win situation:  it could either go to trial on the balance of a $43 million prayer, or it could stipulate to a judgment and protect its non-insurance assets.  It chose the latter, stipulating to judgment in favor of third-party plaintiff KeyWay in the amount of $2.5 million.

The fundamental question posed by HMI's breach of fiduciary duty claim is why, over 16 months after accepting HMI's defense and just 12 days before trial, PCIC was "unable to respond substantively" to a demand for a single, per-"occurrence" limit?  After waiting nearly four years since PCIC assumed HMI's defense and after chasing PCIC down despite three PCIC no-shows for duly noticed depositions, HMI finally got answers via PCIC's FRCP 30(b)(6) deposition on October 15, 2019.

/ / /

/ / /

/ / /

/ / /

Page 30 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

    **3.**    **PCIC's corporate designee revealed the factors relevant to PCIC settlement decisions but could not identify any cogent evaluation of those factors in regard to the claims against HMI in the Underlying Lawsuit.**

As PCIC's standard claims-handling practice, PCIC bases its settlement evaluation on three factors – "coverage[,] liability, and damages."  30(b)(6) Deposition at 78.  PCIC's treatment of these factors is discussed below.

    **a.**    **Coverage:  To this day, PCIC has not reached an indemnity coverage decision (despite formally denying coverage in this action).**

First, as to coverage, PCIC repeatedly swore that "[t]here was no decision made relative to indemnity [coverage]."  *Id.* at 41.

When asked, "At the time of this [$1 million] demand and this letter on March 30th, 2017, was it clear to PCIC which damages were covered and which damages were not," PCIC responded in the negative.  *Id.* at 78.

PCIC was asked, "Is it fair to say that PCIC did <u>not</u> consider the presence or absence of indemnity coverage [in declining to settle] because it didn't know if there was indemnity coverage?"  *Id.* at 93 (underlining added).  PCIC responded, "Yes, . . . that's safe to say."  *Id.*  Yet, PCIC had stated just moments earlier at its deposition that "the coverage defenses are . . . what's driving the [settlement] value of this case."  *Id.* at 90-91.  Taken together, these sworn statements are nothing short of a confession – <u>the "driving" force in PCIC's settlement evaluation were "coverage defenses" "PCIC did not consider.</u>"

PCIC was then asked the extent to which HMI's liability was barred by each of the exclusions raised in its affirmative defenses.  For example, PCIC was asked the "how much of HMI's liability arose out of work precluded by [the Prior Knowledge or Known Loss

Exclusions]?  PCIC's designee responded, "I don't know."  *Id.* at 136.  When asked which of HMI's potential damages at the underlying trial would have been excluded by the Deleterious Substances exclusion, PCIC responded, "[it was] not aware of which ones."  *Id.* at 133.

As noted above, PCIC asserted at deposition that its Ongoing Operations exclusion bars coverage based on certain representations in HMI's policy applications, an argument which is expressly foreclosed by the Oregon Insurance Code, ORS 742.013 and 742.016.  Based upon PCIC's claim file and recent testimony, PCIC's settlement evaluation as it concerns indemnity coverage has, from day one, been preternaturally focused on HMI's policy applications.  *See* Claim Notes at pp. 17, 18 and 22 (noting HMI's policy application as a potential grounds for denying coverage on November 13, 2015 and again on December 15, 2015); 30(b)(6) Deposition at 94 (identifying the policy applications as the basis for withholding settlement authority).  PCIC's indemnity evaluation, to the extent undertaken, was guided by a consideration expressly prohibited by the Oregon Insurance Code.  On the whole, despite not knowing if there was indemnity coverage, PCIC relied heavily on unexplored and/or impermissible coverage defenses to refuse to engage in active and otherwise successful settlement negotiations.

As a final point on PCIC's coverage investigation, what little effort it expended was undertaken by exploiting its fiduciary relationship with HMI and mining the insured's *privileged defense file* for information to use in its apparent *coverage dispute* with HMI.  PCIC conducted its *adversarial coverage investigation* by undertaking discovery on HMI's behalf in the Underlying Lawsuit and then forwarding *the fruits of that fiduciary relationship* to PCIC's "coverage counsel [to] review the same information to glean what it could."  30(b)(6) Deposition at 129.  That is an admission of a textbook breach of fiduciary duty.  A defending fiduciary cannot leverage that special relationship to its advantage against the protected person.  That

Page 32 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

proposition must surely be self-evident. The proper claims handling practice is for the insurer to separate its defense work from its coverage work if there is any possibility of a coverage dispute between the insurance company and the insured. *Stewart Title Guar. Co. v. Credit Suisse, Cayman Islands Branch*, No. 1:11–CV–227–BLW, 2013 WL 1385264, *4 (D. Idaho Apr. 3, 2013) (noting that an insurer may wish to set up separate files so as not to commingle different functions); *Cedell v. Farmers Ins. Co. of Washington*, 176 Wash.2d 686, 699, 295 P.3d 239 (2013) (same). PCIC did not just fail to separate them, it concedes it purposefully combined them. An insurer cannot in good faith repose the fiduciary and adversary functions in the same claim representative.

PCIC admits that it conducted virtually no claim investigation before, during, or after HMI received multiple settlement offers in the Underlying Lawsuit. According to PCIC, it *still* has not completed a claim investigation. What very little coverage investigation PCIC claims to have undertaken was, PCIC openly admits, undertaken based on HMI's privileged defense file. PCIC's breach of its fiduciary duties is undisputed.

>    **b.    Damages: As PCIC had commissioned no expert analysis in its insured's favor for trial, HMI would have been unable to counter underlying plaintiff's damages estimate of $43.4 million.**

As to the second of three bases for PCIC's settlement evaluation, PCIC relies on damages. 30(b)(6) Deposition at 78. Again, underlying plaintiff pegged its total damages at $43.4 million and estimated HMI's share thereof at 20%. HMI was not in a position to rebut these damages at trial: PCIC was asked, "So PCIC does not know whether, had the case gone to trial, the insured would have had an expert to opine on damages?" *Id.* at 105. PCIC responded,

"That would be accurate."  *Id.* at 106.[23]  On March 27, 2017, personal counsel warned PCIC that, should third-party plaintiff KeyWay settle its alleged liability to plaintiff pre-trial, HMI would be left without any expert analysis to counter underlying plaintiff's damages estimate of $43.4 million.  Kolta Dec., Ex. 15 at HMI_0114337.  This warning proved prescient when the global-minus-HMI settlement was reached.

In short, HMI faced the likely prospect of trial in the Underlying Lawsuit without an available expert to rebut plaintiff's $43.4 million in damages.  Thus PCIC acknowledges that the second factor of its settlement evaluation – total damages – would "potentially" have been a non-factor here (at least in terms of arguing for a lower damages number than plaintiff's $43.4 million).  30(b)(6) Deposition at 106.[24]  PCIC knew that its insured's defense was critically hobbled by PCIC's failure to line up an expert for trial, that underlying plaintiff's $43.4 million in total damages would likely have gone unrebutted.

Furthermore, it appears that HMI had no trial expert as a direct result of PCIC's failure to pay HMI's chosen expert.  PCIC's claim file notes that, just two weeks before trial, on March 28, 2017, HMI's expert, earlier retained by defense counsel, was owed $30,000 and was, therefore, undertaking only a "minimal effort . . . until the outstanding amount of $30,000 is brought current."  Claims Notes at p. 3.  At its corporate deposition, PCIC confirmed that it failed to pay HMI's expert but could not explain this critical omission.  30(b)(6) Deposition at 142-143.  Thus it appears no mere accident that "PCIC [did] not know whether . . . the insured would have had

---

[23] PCIC offered additional testimony on this point:  HMI asked, "[D]id PCIC consider in determining the potential for liability of its insured the risk that the other parties would settle around HMI and HMI would be precluded from using the expert testimony of the other parties?  PCIC responded:  "It would appear so, yes."  30(b)(6) Deposition at 104.
[24] Specifically, PCIC's corporate designee was asked whether the lack of an expert to rebut the $43.4 million damages calculation "would take out the damages component" of PCIC's settlement evaluation."  He responded, "Potentially."

Page 34 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

a[] [trial] expert to opine on damages." Rather, HMI had no expert for trial because PCIC stiffed

HMI's would-be trial expert.

      c.     **Liability:  PCIC accepted that HMI faced over $4 million in liability and that $2.5 million was a reasonable settlement**.

Based upon the conclusions of defense counsel and personal counsel , PCIC knew that its

insured faced liability in excess of $4 million.  PCIC testified that it understood HMI to be liable

for up to 10% of plaintiff's $43.4 million in alleged damages.  30(b)(6) Deposition at 100-01.[25]

Further, when asked if it is "PCIC's position that HMI faced greater exposure at trial by the other

parties settling around it," PCIC responded, "of course."  *Id.* at 98.

PCIC also affirmed that $2.5 million, the amount adjudged against HMI, was reasonable,

falling "within the range of the insured's potential liability at trial."  *Id.* at 116.  HMI's expert

herein concurs, pegging HMI's liability in the Underlying Lawsuit "far in excess of the $2.5

million stipulated judgement" and even "in excess of $10 million."  Expert Report at 4.

      4.     **PCIC's claims-handling falls short of every aspect of its fiduciary duty.**

When it declined to engage in settlement negotiations, PCIC had yet to meaningfully

evaluate HMI's **indemnity coverage**, had failed to pay a trial expert to rebut underlying

plaintiff's $43.4 million in **damages**, and accepted that its insured was potentially **liable** up to

$4.3 million.  PCIC itself identifies these bolded terms as the factors upon which it evaluates

settlement, none of which have been meaningfully investigated or considered *to this very day*.

Thereby finding itself hopelessly unprepared to defend its insured at trial, rather than seizing the

---

[25] PCIC was asked if it was possible that the jury would award plaintiff's $43.4 million scope of damages and thus whether "applying ten percent to plaintiff's scope would be a possibility" at trial.  PCIC responded, "Absolutely."

Page 35 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

$1 million, eve-of-trial settlement opportunity, PCIC cut and run, compelling its insured to enter a $2.5 million stipulated judgment, an adjudged amount PCIC itself recognizes as reasonable.[26]

All this begs the question, what did PCIC do to satisfy its fiduciary duty to its insured? PCIC answers this question by stating it was *once* available by phone to discuss settlement but is unsure if it participated in such a call.  Specifically, PCIC was asked at deposition, "[o]ther than attending the mediation, can you identify anything PCIC did to affirmatively attempt to settle the [Underlying] [L]awsuit?"  PCIC responded that it was "not aware of any."  30(b)(6) Deposition at 58-59.  PCIC clarified that it did not attend the mediation in person and may not have attended telephonically.  *Id.* at 59.

Returning to the affirmative requirement of Oregon law, first, "only a [settlement] decision made by an insurer who exercises due diligence in apprising itself of the material facts is entitled to be considered as made in good faith."  *Maine Bonding & Casualty Co*., 298 Or. at 518; *see also* ORS 746.230(d) (establishing as an unfair settlement practice an insurer's "refus[al] to pay claims without conducting a reasonable investigation based on all available information").  Here, PCIC states it was "unable to respond" to a settlement demand of just $1,000,000 on the eve of trial despite conceding that it had everything in its possession to evaluate settlement.  *See* 30(b)(6) Deposition at 80-81 (PCIC stating it had everything it needed on March 30, 2017 to "evaluate liability and damages" and to "evaluate coverage.")  In short, PCIC made a settlement decision absent *any* due diligence, failing to undertake any of the 3-factor settlement evaluation PCIC itself identifies as necessary.  Rather, having defended its

---

[26] PCIC agreed that "$2.5 million is within the range of [HMI's] potential liability at trial according to Mr. Baran."  30(b)(6) Deposition at 116.

Page 36 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

insured to the edge of a cliff and yet mercifully thrown a life line by KeyWay, PCIC could not be bothered to so much as test the rope. These facts are undisputed.

Second, "an insurer has an *affirmative* duty of care to its insured, which in an appropriate case requires the insurer to *initiate* settlement efforts." *Goddard*, 173 Or. App. at 638 (emphases added). PCIC's sworn testimony in this matter is that, not only did if fail to initiate settlement efforts, it declined multiple settlement opportunities despite the resounding clarity of its insured's catastrophic exposure (owing in no small part to PCIC's refusal to pay a trial expert). Incredibly, despite two mediations, two settlement demands, and 16 months defending HMI, PCIC stated at deposition that "[t]here was no opportunity to discuss settlement." 30(b)(6) Deposition at 41. PCIC sat on its hands while its insured twisted in the wind.

Again, the record, much of it comprised of PCIC's statements under oath, establishes a crystal-clear breach of PCIC's fiduciary duty, a course of foolhardy omission that in no way meets the standard described by the Oregon Supreme Court as "the ***punctilio of an honor*** the most sensitive." Frankly, if PCIC's duty to settle is satisfied here by doing nothing more than *perhaps* attending a mediation by phone, the many well-reasoned opinions of Oregon's appellate courts would be rendered dead letters. Thus, while HMI recognizes that bad faith claims often turn on a factual evaluation of whether the insurer's acts are sufficient to meet its claims-handling obligations, here the undisputed factual record speaks for itself. No issue of material fact exists as to PCIC's breach of its fiduciary duty.

As to causation, PCIC's breach on the eve of trial coupled with HMI's exposure in excess of $10 million compelled HMI to stipulate to judgment in the Underlying Lawsuit. As to damages, PCIC recognizes that the judgment of $2.5 million entered against HMI constitutes a reasonable resolution of HMI's exposure in the Underlying Lawsuit. Thus all three elements of

Page 37 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

HMI's bad faith claim are satisfied, and HMI is entitled to summary judgment. *See Alexander Mfg., Inc.*, 666 F.Supp.2d at 1207 ("To prevail in a claim for negligent or bad faith failure to settle within policy limits, an insured must prove: 1) that the insurer breached its duty of care to the insured, 2) causation, and 3) damages.").

## IV.    Conclusion

For all of the foregoing reasons, HMI respectfully requests that the Court grant its motion for summary judgment on both its bad faith breach of fiduciary duty and contract claims, including its request for attorney fees pursuant to ORS 742.061.

DATED this 22nd day of November, 2019.


s/Kristopher Kolta
_____

Michael E. Farnell, OSB #922996
Email:  mfarnell@pfglaw.com
Kristopher L. Kolta, OSB #106442
Email:  kkolta@pfglaw.com
*Attorneys for Plaintiff*

Page 38 – PLAINTIFF HOSPITALITY MANAGEMENT, INC.'S
MOTION FOR SUMMARY JUDGMENT

O:\10412001\0064c klk HMI's MSJ.doc